USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/4/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-

AMIR ELMAANI,

    Defendant.

--------------------------------------------------------x

20 Cr. 661 (CM)

### DECISION ON THE GOVERNMENT'S MOTIONS *IN LIMINE*

McMahon, J.:

    Amir Elmaani is charged in the instant indictment with two counts of tax evasion, in violation of Title 26, United States Code, Section 7201.

    In anticipation of the trial of this matter scheduled for April 24, 2023, the Government has file motions *in limine*. The Government seeks rulings in advance of trial precluding the defendant from (1) introducing mental health evidence for the purpose of raising a diminished capacity defense, which is impermissible under the Insanity Defense Reform Act, and (2) eliciting testimony about self-serving statements the defendant made to law enforcement, including statements about his mental health. Government Memorandum, ECF Doc. 49.

    Elmaani has not filed any *in limine* motions but has filed a response opposing the Government's motion. Elmaani contends that he should be allowed to present evidence, and he and others should be allowed to testify about: (1) Elmaani's mental state, including his mental health, at the time of the offense— not to excuse his conduct based on a diminished capacity, but to refute the Government's argument that he committed affirmative acts with the requisite intent to evade paying his taxes; and (2) Elmaani's purpose in conducting cryptocurrency

1

transactions, including but not limited to his oral and written statements from prior to, and at the time of, the events giving rise to the instant charges. Defense Memorandum, ECF Doc. 50.

Background

*The Indictment*

The Indictment in this case alleges that, in the years 2017 and 2018, the defendant, Amir Elmaani, earned millions of dollars in income—including from his creation of a new cryptocurrency called "Pearl" tokens—and that he failed to pay taxes on almost all of this income. The Indictment alleges that he evaded payment of a substantial part of his income taxes for both years by various means, including: (a) for the calendar year 2017, filing a false income tax return and failing to report substantial income to the IRS; (b) in 2018, using nominees to receive part of his unreported income and transfer it to him; (c) in 2017 and 2018, earning his unreported income by operating a business under a pseudonym and concealing his true identity; (d) in 2017 and 2018, owning assets through anonymous entities and in others' names; (e) obtaining additional unreported income through a cryptocurrency exit scam in October 2018, in which Elmaani attempted to conceal his involvement; and (f) in 2017 and 2018, dealing substantially in cryptocurrency, cash, and precious metals to conceal his unreported income. Indictment 20 Cr. 661 (CM), ECF Doc. 1.

*The Government's Proof*

The Government says that it expects the evidence at trial will prove that, in the fall of 2017, Elmaani created Pearl tokens as part of a data-storage platform he was creating named Oyster Protocol. As part of this project he also started a company in May 2018 called Oyster Protocol Inc. Throughout the entire Oyster Protocol project, Elmaani remained anonymous, shielding his true identity by using only his alias, "Bruno Block."

Elmaani sold Pearl tokens to the public in 2017 through an initial coin offering, or "ICO." Elmaani also created other Pearl tokens that were retained by Elmaani and Oyster Protocol. In 2017 and 2018, Elmaani exchanged a large amount of the Pearl tokens that he personally held on a cryptocurrency exchange ("Exchange-1"), to obtain new cryptocurrency. Elmaani then transferred that new cryptocurrency to a second cryptocurrency platform ("Exchange-2"), where he exchanged it for U.S. dollars. In other words, in 2017 and 2018, Elmaani sold the Pearl tokens he owned for U.S. dollars, through a series of intermediate steps.

In October 2018, Elmaani committed what is colloquially known as an "exit scam:" without telling anyone, Elmaani unilaterally printed millions of new Pearl tokens, then sold them and kept the proceeds (the "Exit Scam"). Elmaani did this by exploiting Pearl's "smart contract," a computer program that created new Pearl tokens. Elmaani accessed this smart contract and used it to create millions of new Pearl tokens for himself, for free.

Elmaani, meanwhile, exchanged his new Pearl tokens for other types of cryptocurrencies before the investing public caught on to the Exit Scam. He ultimately sold that cryptocurrency for US dollars. During this process, Elmaani used "mixers," also sometimes called "tumblers," which are cryptocurrency services that combine transactions from multiple customers to make individual transactions difficult to trace. This had the effect of concealing his movements of cryptocurrency. Elmaani also moved cryptocurrency and dollars through the accounts of his friends and family, including his spouse, which further concealed its source. Elmaani took additional steps to conceal his income, as set forth in the Indictment, including by trading in precious metals.

When the investing public discovered the Exit Scam, Pearl tokens became nearly worthless. When Exchange-1 discovered the Exit Scam, it halted all trading in Pearl, and two

weeks later ultimately delisted Pearl from its exchange. As a result of the Exit Scam, Pearl investors lost substantial amounts of money.

When confronted by Oyster Protocol's CEO two days after initiating the Exit Scam, Elmaani stated that he executed the Exit Scam in part because "taxes are pretty nasty."

*The Innocence Proffer*

On September 27, 2021, the Government met with Elmaani, at Elmaani's request (the "September 2021 Interview"). Elmaani signed an agreement explicitly acknowledging that the Government could "offer at any stage of the criminal proceeding for any purpose any statement made by the Client during the meeting," and that Elmaani could not assert any claim "under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that such statements or any leads therefrom should be suppressed."

During the meeting, Elmaani acknowledged much of the conduct listed above, including his execution of the Exit Scam and subsequent movement of funds. Among other things, he admitted that he minted new Pearl tokens without telling the investing public; this minting of new coins was contrary to Elmaani's prior public statements about Pearl. Elmaani acknowledged that, given these omissions, the individuals and entities who purchased the new Pearl tokens likely believed that they were purchasing from the existing supply of Pearl tokens. He admitted that he used a fake name (Jullz) to commit the smart contract reopening. He admitted to deleting the contents of his Oyster Protocol Inc. email address and to not providing Oyster Protocol Inc.'s employees with his real phone number.

Elmaani admitted that, in 2018, he held as much as $60 million his cryptocurrency, and that he was aware that he needed to pay taxes on his cryptocurrency earnings but did not in fact pay them. He admitted to using "mixers," which as described above are a method of making

4

cryptocurrency transactions harder to trace, and to directing his friends and family members to conduct cryptocurrency transactions for him in their names, and then transfer the proceeds to his account. And he admitted to converting some of his money into gold bars, which he then transported from Rhode Island to Virginia, where a family member sold them on his behalf. He also admitted to using the money he made to purchase at least two multi-million dollar luxury yachts.

Elmaani also made what the Government characterizes as self-serving statements in an attempt to argue that his admitted conduct was not for the purpose of evading taxes. The Government says that, in his statement to the Government, as well as multiple written submissions, Elmaani contended that his deceptive conduct was not designed to evade taxes but was rather to evade the scrutiny of Oyster investors, his employees, and the online community. He also contended that, during this period, he was suffering from trauma and was overwhelmed by his conviction that the world financial system was on the brink of collapse. He contended that his primary motivation in this period was to retrofit his yachts so that he could provide for his family once the financial system collapsed, and that the stress from his fears left him unable to focus on his taxes. He claimed that he never saw a 1099 tax form from Exchange-2—despite evidence that Exchange-2 did in fact mail him a 1099—and that without a 1099, the prospect of calculating his total income from the cryptocurrency sales became an overwhelming problem that he was unable to address.

Government Memorandum at 1-4.

Government's Motion to Preclude Diminished Capacity Defense Evidence

*Applicable Law*

    1. Elements of Tax Fraud

In order to prove beyond a reasonable doubt that defendant committed tax evasion under 26 U.S.C. § 7201, the Government must prove three elements at trial: "(1) the existence of a substantial tax debt, (2) willfulness of the nonpayment, and (3) an affirmative act by the defendant, performed with intent to evade or defeat the calculation or payment of the tax." *United States v. Josephberg*, 562 F.3d 478, 488 (2d Cir.2009).

    2. Insanity Defense Reform Act

In 1984, Congress enacted that Insanity Defense Reform Act, or "IDRA," which was intended to "place a number of limitations on a criminal defendant's ability to introduce mental health evidence." *United States v. Jones*, 2018 WL 1115778, at *4 (S.D.N.Y. Feb. 27, 2018); Insanity Defense Reform Act of 1984, 18 U.S.C. § 17(a) (the "IDRA"). The IDRA established an affirmative insanity defense in cases where the defendant, "as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). "Mental disease or defect does not otherwise constitute a defense," however. *Id.*

In enacting the IDRA, Congress sought to achieve several principal objectives, including: (1) the elimination of any form of legal excuse based on a defendant's lack of volitional control; (2) the preclusion of defenses based on "diminished responsibility" and similar theories through which defendants had previously sought to excuse or justify their conduct by relying on evidence of a mental impairment; and (3) the reduction of dangers posed by expert psychiatric

6

testimony regarding inherently malleable concepts, which could be misused to mislead and confuse juries in criminal cases. *See United States v. Cameron*, 907 F.2d 1051, 1061-62 (11th Cir. 1990).

While the IDRA bars "alternative 'affirmative defenses' that 'excuse' misconduct, it does not bar mental disease evidence that disproves an element of the crime itself." *United States v. Ray*, 583 F. Supp. 3d 518, 534 (S.D.N.Y. 2022) (quoting *United States v. Pohlot*, 827 F.2d 889, 897 (3d Cir. 1987)) (precluding expert testimony about defendant's longstanding persecutory beliefs and paranoia as inadmissible mental health theories for various crimes including extortion and tax evasion charges). For example, even under the IDRA, the defendant may "submit[] mental health evidence for the purpose of rebutting the prosecution's proof of the *mens rea* element of a specific intent crime." *United States v. Dupre*, 462 F.3d 131, 137 (2d Cir. 2006). However, "The district court, in the first instance, must police the boundaries between permissible . . . evidence that goes to negating the intent element of a crime *and impermissible evidence that seeks to 'excuse' the crime." Ray*, 583 F. Supp. 3d at 534. (Emphasis added). In other words, "the court must guard against the risk 'that mental-health evidence—even if characterized as strictly relevant to negate intent—will result in the resurrection of precisely the kinds of defenses that the IDRA was enacted to prohibit.'" *Id.* at 534-35 (quoting *Cromitie v. United States*, 2017 WL 1383982, at *5 (S.D.N.Y. Apr. 7, 2017)); *see also United States v. Pirro*, 76 F. Supp. 2d 478, 485 (S.D.N.Y. 1999) ("Mental disease evidence is generally excluded where no link is demonstrated between the evidence and the defendant's *mens rea* or where the defendant could not demonstrate that he actually lacked *mens rea* at the time of the offense because of any psychological defect."). Thus, "if the risk that the jury will interpret the evidence to support an affirmative defense that is impermissible under the IDRA rather than to negate the

7

*mens rea* element of the offense substantially outweighs the probative value of the evidence, it must be excluded." *Jones*, 2018 WL 1115778, at *5.

*Government's Argument*

The Government points out, correctly, that in order to establish a criminal violation of the federal tax laws, it must establish, among other things, that the defendant acted "willfully," that is that the defendant had actual knowledge that the law imposed a legal duty, and that he or she voluntarily and intentionally violated that duty. *Cheek v. United States*, 498 U.S. 192 (1991). The Government is concerned that Elmaani will attempt to use his self-serving statements about his mental health to excuse his failure to report his millions of dollars in taxable income. The Government argues that arguments about Defendant's mental health do not go to the issue of *mens rea*, as they do not suggest either that Elmaani was unaware of his legal duty to pay taxes, or that his conduct was somehow involuntary. "At best, arguments about Elmaani's stress level, preoccupation and apocalyptic world view provide justifications or mitigation for his criminal conduct and, as such, are precisely the type of evidence that is precluded under the [Insanity Defense Reform Act, or] IDRA." Govt. Memo at 6. Accordingly, the Government asks the Court to preclude the defense from introducing evidence about his mental health.

*Defendant's Position*

In his response, Elmaani says that during the relevant period, he was indeed suffering from trauma and was overwhelmed by his deeply held conviction that the world financial system was on the brink of collapse, and that, his "overriding focus in this period was to retrofit his boats so that he could provide for his family after the collapse of the financial system." Def Memo at 5. But Elmaani says that he does not intend to offer an affirmative defense of

8

diminished capacity.[1] He also says that he will not contest the "willfulness" element of his charges (Second Element), or the "existence of a tax deficiency" (First Element)—although, Elmaani maintains that "he is unaware of (and is not conceding to) the specific amount of his tax deficiency." Indeed, Elmaani specifically says in his response that he does not contend that his being overwhelmed, stressed, and traumatized by his belief that the world was upon the brink of financial collapse, as well as suffering from bipolar disorder and obsessive-compulsive disorder, rendered him incapable of filing a return such that the failure to file was not "willful" within the meaning of 26 U.S.C. 7201. Def. Memo at 5

Elmaani does, however, intend to contest the third element— an affirmative act constituting the evasion or attempted evasion of the tax. Def. Memo at 6. It is Elmaan's position that he should be allowed to present evidence of his mental health—as manifest in his irrational belief about the imminent collapse in the world economy—to show that "any affirmative act he undertook was not done to evade any tax that was owed," but rather "to evade the scrutiny of Oyster investors, his employees, and the online community." Def. Memo at 4.

The Government's motion is Granted.

## Discussion

The motion before the court highlights why mental health evidence is permitted only in rare and narrowly defined circumstances. Defendant's proposed mental health evidence qualifies as "impermissible evidence that seeks to 'excuse' the crime." *Ray,* 583 F. Supp. 3d at 534, rather than evidence offered to negate the intent element.

---

[1] Indeed, Elmaani did not file "Notice of Expert Evidence of a Mental Condition," pursuant to Rule 701(b) of the Federal Rules of Criminal Procedure, as is required when interposing a lack of capacity defense.

Elmaani will not be permitted to present evidence about having been diagnosed with, or otherwise suffering from bi-polar disorder, depression, or any other mental disorder. Such evidence is precisely the type of evidence that is precluded under the IDRA. Elmaani wants the mental health evidence admitted so that he can argue to the jury that he was so delusional back in 2017-2018, that they should believe his implausible defense that the financial transactions he engaged in were solely done to shield money from investors, and not with an intent to circumvent his admitted and acknowledged tax duty. The problem is that there is a significant chance that the jurors might misinterpret such evidence as suggesting that defendant had a diminished capacity and that his actions should be excused for that reason. *Jones*, 2018 WL 1115778, at *5 (If the risk that the jury will interpret the evidence to support an affirmative defense that is impermissible under the IDRA rather than to negate the *mens rea* element of the offense substantially outweighs the probative value of the evidence, it must be excluded."). Therefore, the evidence will not be allowed.

Defendant will still be able to cross-examine the Government's witnesses, present evidence (if he chooses to do so), and argue in his summation that his intent behind his financial maneuvering—the actions that the Government will argue is evidence of his intent to avoid paying tax—was solely to evade the scrutiny of Oyster investors, his employees, and the online community. Defendant will be permitted to present evidence about his state of mind; for instance, that his actions were motivated by his concern about the volatility of cryptocurrency market and his belief that the world was on the cusp of economic Armageddon. Oh, and yes, that his "overriding focus during this period was to retrofit his [two multi-million dollar luxury yachts] so that he could provide for his family after the collapse of the financial system." Unfortunately for Defendant, these motives can exist side by side with an intent not to pay

money the Defendant admits he owed the Government.

Government's Motion to Preclude Defendant's Out-of-Court Statements

The Government says that it may seek to offer statements made by the defendant during the September 2021 Interview (The Innocence Proffer). *See* Govt. Exhibit A (The FBI's Form 302 memorializing that interview, with the portions the Government seeks to introduce highlighted in yellow).

The statements that the Government proposes to introduce are limited to the defendant's admissions about specific facts, including his execution of the Exit Scam, his knowledge that he needed to pay taxes, and the methods he used to move his money around. All of that is admissible and will be allowed in evidence.

The Government moves to preclude defendant's attempt to introduce at trial certain other out-of-court statements made during the September 2021 Interview and in written submissions he made in advance of that interview. The Government argues that these statements include self-serving excuses about his motivations behind his evasive financial maneuvers, such as his worries about being criticized by the investing public and his concerns that the world financial system was about to collapse. The Government argues that this evidence, if offered by the defendant for the truth of the matters asserted therein, constitutes inadmissible hearsay and should be excluded at trial

Elmaani asks that he be allowed to introduce additional portions of the interview that are necessary "to place the Governments' selections in context, to avoid misleading the jury, and/or to ensure a fair and impartial understanding of the admitted portion." Def Memo at 6. Elmaani says that he also seeks to have portions of the interview admitted, not for the truth of the matters asserted therein, but as evidence of Elmaani's state of mind at the time of the

11

interview. *Id.*

Finally, Elmaani asks that he be allowed to introduce contemporaneous statements related to his state of mind and motivation for undertaking the alleged criminal acts, as his intentions are an element of the crime charged.

The Government's motion to exclude is Granted.

*Relevant Law*

A hearsay statement is an "out-of-court statement offered to prove the truth of the matter asserted." *Danis v. Velez*, 797 F.3d 192, 200 (2d Cir. 2015). However, a "party's own statement, if offered against him, is not hearsay." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); Fed. R. Evid. 801(d)(2). Statements made by a defendant, when offered by the Government, are generally admissible "regardless of whether such statements were against his interest when made." *United States v. Gotti*, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006).

It is well-established that a defendant does not have a parallel ability to offer his own statement into evidence. "[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible." (internal quotation marks omitted)). To the extent a defendant argues that his statements are admissible as a declaration of his then-existing state of mind under Rule 803(3) of the Federal Rules of Evidence, that hearsay exception applies only to statements that "face forward, rather than backward." *United States v. DiMaria*, 727 F.2d 265, 271 (2d Cir. 1984); *United States v. Blake*, 195 F. Supp. 3d 605, 610-11 (S.D.N.Y. 2016) (precluding a defendant from introducing her own out-of-court statements to law enforcement officers in which she

pointed the finger at co-defendants as reflecting a then-existing state of mind because such statements reflected a "self-serving explanation of past events"); *United States v. Dinga*, 609 F.3d 904, 908-09 (7th Cir. 2010) (affirming the rejection of a defendant's attempt to introduce evidence of his offer to take a polygraph after his arrest).

"In addition, 'the reasons for the state of mind exception focus on the contemporaneity of the statement and the unlikelihood of deliberate or conscious misrepresentation.'" *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (quoting *United States v. Cardascia*, 951 F.2d 474, 487 (2d Cir. 1991)). "Thus, to fall within Rule 803(3)'s 'state of mind' hearsay exception, the statements sought to be introduced must relate to the declarant's state of mind *during* the [illegal conduct]" and not what the declarant "said or did *after* the [illegal conduct] had taken place and as the scheme itself was being discovered." *United States v. Netschi*, 511 F. App'x 58, 61 (2d Cir. 2013) (affirming district court's exclusion of statements the defendant "made and reactions he had concerning the unraveling of the scheme"). For that reason, "self-serving explanation[s] of past events" are not admissible under Rule 803(3). *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (refusing to admit a defendant's self-exculpatory statements about his past conduct); *see also United States v. Annabi*, No. S1 10 Cr. 7 (CM), 2012 WL 489111, at *2 (S.D.N.Y. Feb. 14, 2012) ("*ex post facto* justifications for payments" that were made previously were inadmissible hearsay).

Nevertheless, under Rule 106 of the Federal Rules of Evidence, there are certain instances in which a defendant may require the admission of certain portions of a statement when the Government offers excerpts of a statement under the so-called "rule of completeness." However, Rule 106 "does not render admissible evidence that is otherwise inadmissible." *United States v. Terry*, 702 F.2d 299, 314 (2d Cir. 1983). Thus, the rule of completeness

13

requires admission of a hearsay statement only when the statement is "*necessary* to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (emphasis added) (quoting *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987)). "The completeness doctrine does not, however, require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." *United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999). "Where the danger of such distortion does not exist, . . . a defendant may not rely on the rule of completeness to put his out-of-court exculpatory statements before the jury . . . , while at the same time maintaining his own Fifth Amendment privilege so as to avoid being cross-examined about his prior statements." *United States v. Harper*, No. 05 Cr. 6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009); *Jackson*, 180 F.3d at 73 (no abuse of discretion to preclude portion of tape that included defendant's "own self-serving statements"); *see also United States v. Gonzalez*, 399 F. App'x 641, 645 (2d Cir. 2010) ("[T]he rule of completeness is not a mechanism to bypass hearsay rules for any self-serving testimony.").

*Discussion*

The Court has reviewed the full statement from the September 21 interview. The statements that the Government has identified are admissible as party admissions under Rule 801(d)(2) of the Federal Rules of Evidence.

Defendant, of course, cannot elicit his own self-serving statements from that interview to deny or explain away his involvement in the offense conduct. His out-of- court statements are classic hearsay.

I see nothing in the interview that would need to be admitted for "rule of completeness

reasons. However, at the final pretrial conference Defendant can identify any statement from the interview that he believes needs to be included in order for the jury to understand the Government's evidence (but not to explain his behavior). Self-serving "post-hoc explanations for prior conduct" will not be admitted. *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016) (holding that rule of completeness did not require admission of full grand jury testimony where omitted statements were post-hoc explanations that did not alter the meaning of the admitted testimony).

    This represents the decision and order of the Court.

April 4, 2023

                                    Colleen McMahon